## BEACH v. THE STATE BANK.

An authority to draw a bill is virtually an acceptance of the bill drawn in conformity to it.

If a bill be accepted in the name of one partner only, and not in that of the firm, yet if the bill be addressed to the firm, all the members of it, whether dormant or not, will be bound by such acceptance.

One partner will be bound by the fraud of his co-partner in contracts relating to the partnership made with innocent third persons.

A partner cannot bind his co-partner by an accommodation acceptance,

unless that partner consent thereto, and that consent may be established by positive proof, or inferred, from the prior or subsequent conduct of such partner. And if the accommodation acceptance pass into the hands of a *bona fide* indorsee for value, the co-partner will be bound to such indorsee, even if his consent cannot be shown.

Where a debtor gives to his creditor collateral security upon the aggregate amount of several separate claims, the proceeds of such collateral security must be applied, *pro rata,* upon each of the claims.

ERROR to the *Cass* Circuit Court.

PERKINS, J.—Assumpsit by the *State Bank of Indiana,* for the use of the branch at *Michigan City,* against *Henry B. Williams, Lewis Chapin,* and *Ebenezer S. Beach,* partners under the name of " *H. B. Williams* and *Co.*" The declaration contains the common, and twenty-two special counts. The special counts are upon bills of exchange. Some of the counts describe bills drawn by *S. P. Williams* to the order of *Williams* and *Hitchcock,* upon *H. B. Williams* and *Co.,* and indorsed to the bank by *Williams* and *Hitchcock,* and allege their acceptance by *H. B. Williams* and *Co.,* by the name of *H. B. Williams.* Other counts describe bills drawn by *S. P. Williams* to the order of *Williams* and *Hitchcock,* on *H. B. Williams* and *Co.,* and allege that they were drawn under a letter of credit from *H. B. Williams* and *Co.* authorizing the same, and that they were indorsed to the bank by *Williams* and *Hitchcock,* and, afterwards, presented by the bank to the drawees for acceptance and for payment, and that acceptance and payment were refused, &c. Other of the counts still vary the description of the cause of action. No question arises upon the declaration, and no evidence, we may remark, was offered upon the common counts. Process was returned not found as to *Williams* and *Chapin; Beach* appeared and pleaded the general issue under oath. There was a jury trial; verdict and judgment for the plaintiff for over 10,000 dollars. The evidence and instructions are upon the record. A motion for a new trial was denied.

The plaintiff gave in evidence the following letter of credit, proved to have been drawn and signed by *H. B. Williams:*

VOL. II.—62

*May Term, 1851.*

BEACH
v.
STATE BANK.

*Tuesday, May 27.*

"*Rochester*, *Sept.* 4, 1841. The bearer, *Samuel P. Williams*, one of the firm of *Williams* and *Hitchcock*, is authorized to draw on us to the amount of twenty thousand dollars, at such times as he pleases.

*H. B. Williams* and *Co.*"

Also, five bills of exchange, each described in one or more of the counts in the declaration, as a sample of which the following is copied. The signature of *S. P. Williams* was proved :

"$2,000.          *Michigan City, September* 10, 1841.

"Four months after date, pay to the order of *Williams* and *Hitchcock*, at the *Merchants' Exchange Bank, New York*, two thousand dollars, value received, which place to account of your obed't serv't.          *S. P. Williams.*

"To *H. B. Williams* and *Co.*"

Across the face of the bills was written, in blue ink, "*H. B. Williams, Oct.* 2, 1841," in said *Henry B. Williams's* hand-writing. The bill was indorsed, in the hand-writing of *S. P. Williams*, "*Williams* and *Hitchcock.*"

It was proved that there were two firms at *Rochester, New York*, one named "*H. B. Williams* and *Co.*," the other "*Williams* and *Hitchcock*," and that the business of both was the purchasing of wheat and the manufacturing and selling of flour, but that there was no partnership connection in business between the two firms; that the former was composed of *Henry B. Williams, Lewis Chapin*, and *Ebenezer S. Beach*, the defendant below to this suit; and the latter of *Samuel P. Williams* and *Irad Hitchcock*, one of whom was a son, the other a brother-in-law, of *Henry B. Williams* of the former firm; that each firm transacted a large business with the banks, and that said *Henry B.*, here usually designated *H. B. Williams*, was the active member of the firm of *H. B. Williams* and *Co.*, and was in the habit of drawing bills, &c., in the firm name. It was also proved that he was in the habit of indorsing and accepting paper drawn upon him individually, in his own name, for the accommodation of *Williams* and *Hitchcock*, and of advising them in their business; and

that all these facts were known to the *Michigan City* bank at the time the bills in question were discounted. It was also proved that *H. B. Williams* and *Co.* had an agent, *Underhill Dunn*, in the southern part of *Michigan*, purchasing wheat and flour for them, and that *Williams* and *Hitchcock* had an agent, *James McAdoo*, in the northern part of *Indiana*, engaged for them in like business; that at the time it bears date, *Samuel P. Williams*, of the firm of *Williams* and *Hitchcock*, received at *Rochester, New York*, from *Henry B. Williams*, the letter of credit above set forth, came immediately with it to *Indiana*, deposited it with the *Michigan City* bank, and, under it, drew the bills of exchange sued on, indorsed them, and negotiated a part of them to the bank, received the money for them, and made arrangements for *McAdoo*, the agent of *Williams* and *Hitchcock*, and for *Hitchcock*, one of said firm, to negotiate the balance, which they afterwards did; that said bills were afterwards presented at the office of the firm of *H. B. Williams* and *Co.*, in *Rochester*, for acceptance by said firm, and were there accepted by said *Williams*, as was understood, on behalf of the firm; that the money received from the bank for the bills was all expended in the purchase of wheat and flour for *Williams* and *Hitchcock;* that at the time the bills were discounted no questions were asked and nothing was said as to whose use the money was to be applied, though *Orr*, the president, and *Andrews*, the cashier of the bank, say, in their testimony, that they supposed it was for the use of *H. B. Williams* and *Co.*, though the bank had confidence in both firms; that said *Orr* had had interviews, subsequently, with *Chapin* and *Beach* separately, without, however, having with him the bills or letter of credit; that they conversed upon the subject; that those men did not deny *H. B. Williams's* authority to give the letter of credit, but that *Beach* complained of being sued; said he should give all the trouble he could; grumbled about the kind of money and the application of the proceeds of the collateral security; said they had a disastrous business year, &c.; that *Williams* and *Hitchcock* did business individually with

May Term,
1851.

BEACH
v.
STATE BANK.

the bank for *H. B. Williams* and *Co.*, and that other agents of said firm were also in the habit of raising money at said bank, on drafts on *H. B. Williams* and *Co.*, for the purchase of produce in the west. Such substantially is the evidence upon the record. Numerous instructions were given to the jury, many of which, it is contended by the counsel for the plaintiff in error, are erroneous, and we are earnestly urged to rest our decision of the cause upon them and not upon the evidence. It was, in the first instance, a question for the jury, under proper instructions from the Court, whether or not *Beach* was liable in this suit; but the Court could set aside their finding if it was palpably wrong, and confirm it, if probably right; and we think it would hardly serve any good purpose to lengthen this opinion by incorporating into it those instructions and adding thereupon the necessary remarks, as the evidence appears to us satisfactory upon the point of liability.

Before examining the evidence, however, it will be proper to refer to two or three established legal principles.

1. "An authority to draw a bill is virtually an acceptance of the bill drawn in conformity to it." *Ulster County Bank* v. *McFarlan*, 5 Hill (N. Y.) R. 432.—*Bayard* v. *Lathy*, 2 McLean, 462, and the cases there collected.

2. "If a bill be accepted in the name of one partner only, and not in that of the firm, yet if the bill be addressed to the firm, all the members of it, whether dormant or not, will be bound by such acceptance." Coll. on Part. by Perk. 371, 372.—Story on Part. 161, note 1.— 3 Kent, 41.—Chit. on Bills, 69. This must be, of course, in cases where the firm would be bound, were the bill accepted in the name of the firm.

3. "One partner will be bound by the fraud of his copartner, in contracts relating to the partnership made with innocent third persons." Coll. on Part. 401.

The letter of credit in this case, then, being a virtual acceptance of the bills drawn under it, and those bills having been also, in legal effect, afterwards accepted, but one question arises upon the letter and bills, viz.: whe-

ther they were drawn and accepted under such circumstances that the firm was bound by them.

The bank is the indorsee for value of accepted bills, and, *prima facie*, the firm of *H. B. Williams* and *Co.* was liable upon them in this suit, and it devolved upon the defendant below to establish the contrary. *Austin* v. *Vandermark*, 4 Hill (N. Y.) 259. To remove this presumption of liability, it is assumed in argument, by the counsel for *Beach*, that the evidence shows that the acceptances in question were for the accommodation of *Williams* and *Hitchcock*, and that the bank knew, or had good reason to believe, the fact when she discounted them.

As a general rule a partner cannot bind his co-partner by an accommodation acceptance, unless that partner consent thereto; and that consent may be established by positive proof, or inferred from the prior or subsequent conduct of such partner. And if the accommodation acceptance pass into the hands of a *bona fide* indorsee, for value, the co-partner will be bound to such indorsee, even if his consent cannot be shown. Coll. on Part. Perk. Ed. 381, note 2. But, in the case before us—

1. There is no direct proof of the fact assumed, viz.: that the acceptances were for the accommodation of *Williams* and *Hitchcock;* for (we may remark) we disregard altogether the testimony of *H. B. Williams*. He swore that they were, and that they were not, accommodation acceptances, and his statements are such as to completely neutralize each other. We have not noticed his testimony in stating the evidence in the cause. The letter of credit was not to the firm of *Williams* and *Hitchcock*, nor expressed to be for their benefit; and it was such an one as would have naturally been given to a purchasing agent of their own firm by *H. B. Williams* and *Co.* True the proceeds of the bills did not go to the benefit of this latter firm, but this is not proof that they were not accepted with the expectation that those proceeds would be so applied. Agents sometimes misapply the means with which they are intrusted. And;

2. The circumstances in this case were not such as

would lead the bank, when the bills were discounted, to suppose them to be accommodation bills. They do not seem to have been out of the usual course of *H. B. Williams* and *Co.*, in raising money for their own purposes in the west. That firm uniformly accepted such bills drawn by their purchasing agents; and it seems, from the testimony, that *Williams* and *Hitchcock* were sometimes individually made such agents, and did business for said firm with the bank; and it would seem, therefore, that they drew bills separately upon *H. B. Williams* and *Co.*, which were accepted and paid, for such was the only kind of business that that firm had with the bank. Whereas, when *Williams* and *Hitchcock* drew bills for their own accommodation, as a firm, they drew upon *H. B. Williams* alone, who was, and was known to be, their accommodation acceptor. This is an important fact in the testimony; and with reference to it, when *Samuel P. Williams* drew the bills in question and indorsed them to the *Michigan City Bank*, he, in effect, said to the bank, these bills are for the benefit of *H. B. Williams* and *Co.*, and the previous course of that company in regard to such bills would seem to have authorized the bank to believe, what *Williams* virtually said, to be true. We think the transaction in this case had the appearance, to the bank, from all the circumstances, of being for the benefit of *H. B. Williams* and *Co.*, and that the jury properly so found the fact, though had they found otherwise, their verdict would not have been set aside.

Another question in the case it is necessary for us to decide. *Williams* and *Hitchcock* received from the bank, at the time of its date, the following instrument:

" Received, *December* 3, 1841, of *Williams* and *Hitchcock*, in the store of *Goodhue* and *McAdoo*, as per their receipts of this date, 13,500 bushels of wheat as collateral security for the payment of the following described drafts or bills of exchange heretofore negotiated at the branch bank by *Williams* and *Hitchcock*, to-wit, the draft drawn by *Williams* and *Hitchcock* accepted by *H. B. Williams*, dated *August* 30, 1841, at 4 mos. after date,

$2,000. One other draft, same parties, dated *Sept.* 4, 1841, at 4 mos. date, $1,000. One other do., same parties, *Sept.* 7, 1841, at 4 mos. date, $1,000. One other do. same parties, *Sept.* 8, 1841, at 4 mos. date, $1,000. One other do., drawn by *S. P. Williams*, accepted by *H. B. Williams* and *Co.*, dated *Sept.* 16, 1841, at 4 mos. date, $2,000. One other do., same parties, *Sept.* 16, 1841, at 4 mos. date, $1,000. One other do., same parties, *Sept.* 11, 1841, at 4 mos. date, $1,000. One other do., same parties, *Sept.* 10, 1841, at 4 mos. date, $2,000. One other do., same drawer, accepted by *H. B. Williams*, dated *Sept.* 16, 1841, at 4 mos. date, $1,000. One other do., same parties, *Sept.* 10, 1841, at 4 mos. date, $1,000. One other do., drawn by *Williams* and *Hitchcock*, accepted by *H. B. Williams*, *Sept.* 16, 1841, at 4 mos. date, $1,000." Then follows a description of four other drafts, same drawers and acceptor as in the last described, and the article proceeds : " It is understood that the last named drafts, amounting, in the aggregate, to ten thousand five hundred dollars, may be renewed by the payors substituting therefor, at or before maturity, the drafts of *Williams* and *Hitchcock* to the order of, and indorsed by, *H. B. Williams* and *Co.*, on *Eli Hart* and *Co.*, of *New York*, for same amount including interest, and payable on some fixed day in all the month of *June* next. It is further understood, that if the first six drafts herein described, amounting, in the aggregate, to eight thousand dollars, are paid at maturity agreeably with the tenor thereof, and the other nine drafts are paid or renewed as above, and accepted by *Eli Hart*, and *Co.*, the wheat herein held as aforesaid to be delivered in store to the said *Williams* and *Hitchcock*, or their order; but in case the said drafts are not paid or arranged as above, the said wheat to be sold and the proceeds applied towards the payment of said drafts. In the meantime," &c.

" *A. P. Andrews*, cashier," &c.

The drafts were not paid or arranged as contemplated in said instrument, the bank sold the wheat and applied the proceeds exclusively upon those drafts drawn upon

May Term, *H. B. Williams* alone, and this application was held right
1851. in the Court below. In this, we think there is error. We
BEACH are referred, in support of the decision below, by the
v. counsel for the bank, to the general rule that where the
STATE BANK.
debtor fails to make application of a payment to a par-
ticular debt, the creditor may make the application. But
the question in this case is, not what is the general rule
on this subject, but has the debtor actually made an ap-
plication, and if so, what? We think the instrument in
question, by a proper and equitable construction, shows
that an application was made by the debtor's assigning
the wheat, at the time of its assignment, and that it was
an application of the proceeds of the wheat towards the
payment of all the bills named, *pro rata.* This construc-
tion is supported by the case of *Perris* v. *Roberts*, Vern.
34. *Perris* became bound unto *Roberts* as surety for *F.
S. F. S.* owes *Roberts* a further debt upon simple con-
tract. *F. S.* and *Roberts* come to a stated account for
all moneys owing to *Roberts*, as well for what was due on
the bond in which *Perris* was bound as surety, as for
what was due to *Roberts* upon simple contract; and there
being due to *Roberts* on the foot of the account, 85*l*, *F.
S.* makes him a bill of sale towards satisfaction of the
whole debt. It was insisted that the money raised by the
bill of sale should be applied in the first place to satisfy
the debt due on simple contract, it having been decided
at the same term, in *Hayward* v. *Lomax*, Vern. 24, that
where a man owes money on mortgage drawing interest,
and to the same person, other money due on account not
drawing interest, and he makes a general payment with-
out mentioning the debt to which it should be applied, it
should go to reduce the mortgage; but the chancellor
held that the money raised by the bill of sale should be
applied, *pro rata*, for the sinking of both debts, "and
solely upon this reason, viz., that both debts had been
cast into one stated account and the bill of sale made
towards satisfaction of the whole debt." The correctness
of the decision in this case has never been denied.
Burge on Sure. 127.—Chit. on Cont., 7 Am. Ed. 756,

note 1. See this note, also, for other cases of *pro rata* application.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c.

*Z. Baird*, for the plaintiff.

*D. D. Pratt* and *J. B. Niles*, for the defendant.

NOTE.—Upon the announcement of the decision, the defendant in error offered to remit the excess over the true amount for which judgment had been rendered below, and was permitted to do so; whereupon the judgment was affirmed for the balance.